JOHN WILSON, Appellant, *v.* DEXTER SULPHITE PULP AND PAPER COMPANY, Respondent.

*Wilson* v. *Dexter Sulphite Pulp & Paper Co.,* 86 App. Div. 629, affirmed.
(Argued April 25, 1905; decided May 30, 1905.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered July 16, 1903, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

*Edgar C. Emerson* and *Curtis L. Hildreth* for appellant.

*Henry Purcell* for respondent.

Judgment affirmed, with costs ; no opinion.
Concur : CULLEN, Ch. J., GRAY, O'BRIEN, HAIGHT and WERNER, JJ.

BARTLETT, J. (dissenting). I am of opinion that the learned trial judge committed reversible error in nonsuiting the plaintiff, as there was sufficient evidence to carry the case to the jury that the foreman or agent in charge of the work was not a co-servant, but the *alter ego* of the defendant corporation.

This is a negligence action in which the plaintiff, a boy aged about twenty years at the time of the accident, seeks to recover damages by reason of falling through an alleged unsafe roof, where he was engaged under orders of the foreman in removing the old shingles; he fell a distance of some twenty-seven feet sustaining the injuries of which complaint is made.

The sharply litigated question is whether the defendant corporation, through its representative, was chargeable with knowledge of the condition of this roof that led to the accident. The defendant corporation was engaged at Dexter, Jefferson county, in the business of digesting wood into pulp. This business was conducted in a very old building that had been used prior to the occupancy of the defendant for some other purpose. A witness testified that he had been familiar with the property for fifty or sixty years, and that the roof had existed for between forty and fifty years. It appears that the roof consisted of rafters running to a peak and covered by roof boards which in turn were shingled. Beneath this roof was a large room in which were placed a number of digesters, so-called, which appear to have been something like large horizontal boilers in which wood was placed. An expert testified that the method of digesting consisted in manufacturing sulphurous acid, which, in combination with other chemicals not necessary to detail, was passed through pipes into the digesters, where the wood in time was reduced to pulp; thereupon the gases, which were under high pressure, were blown out of the digesters, thus causing a volume of heated gas to fill the room. The expert testified that "if the gas escapes in the air it unites with the moisture and the oxygen of the air turns it into surphuric acid and that is precipitated on articles; that it had a corrosive effect, the same as rotting or burning; it had a destructive effect." The expert further testified: " I have observed the effect of sulphuric acid when brought

in contact thus with mineral substances, iron, for instance; it has the same effect, a corrosive effect; the sulphuric acid unites with the iron, or with any other metal that it can combine with — and it will combine with almost everything. It changes it into a sulphate, changes the iron into a sulphate, destroying the surface of the iron as it unites with it." It appears that the processes of the defendant had been carried on in this digester room for at least nine years, and possibly much longer.

The tendency of this evidence was to establish the fact that this roof had been subjected, not only to, the "gnawing tooth of time," but to the deteriorating effect of chemicals. This is one phase of the case that should have been submitted to the jury. It was also a question for the jury whether the very long period of time that this roof had existed was not of itself sufficient to charge the defendant with knowledge of its unsafe condition, or, at least, to have subjected it to a thorough examination before sending men upon it to remove the shingles. It appears that the plaintiff had labored but a few moments when from eight to twelve square feet of the roof gave way, precipitating him to the floor beneath, a distance of some twenty-seven feet.

There is still a third and more serious aspect of the evidence, which not only should have been submitted to the jury, but would have sustained a directed verdict for the plaintiff had the defendant seen fit to rest its case without the introduction of evidence. The evidence, as it now stands, in my opinion, brings to the knowledge of the defendant the fact that the roof was rotten and consequently unsafe. It was proved that the defendant was engaged not only in demolishing the old roof, but in constructing, some five or six feet below it, a new roof, with iron girders or rafters. One witness testified as follows: "I sawed out along the edge of the roof upon the eaves, the place for those rafters to rest, upon the plate or wall; I observed the condition of the rafters where I sawed along the edge of this roof, somewhat; I saw that they were decayed a little; when they pulled them out of the timbers at the bottom they were decayed some, where they were put together; where I cut the hole through the

side, the side dropped down off the edge of the roof; I cut it through there and on through to the edge of the roof, and from there I took the boards out ; and where the timbers or the rafters (whatever you call them) went into the timbers, they were bad ; they were decayed or rotten at the bottom, where they go in."

Another witness testified : " I helped remove the roof on the opposite side of the building from where John (the plaintiff) fell ; the rafters on that side were rotten and decayed ; some of them when you would take them down, if you would drop them very heavy, they would break in two ; there were different lengths of rafters there ; I should say the rafters were about three feet apart."

This evidence, uncontradicted, would authorize a jury to find that this roof was unsafe to the knowledge of the defendant. There is also an abundance of evidence in this record which establishes the fact that the refuse of boards, rafters and other material, the result of the tearing down of this roof, were rotten and decayed, indicating the great age and unsafe condition of the structure. The fact already alluded to, that almost immediately after the plantiff, a boy twenty years of age, goes upon this roof, from eight to twelve square feet go down under his weight, precipitating him to the floor below, is confirmatory of the statement of several witnesses as to the decayed condition of the structure.

The counsel for the plaintiff moved to go to the jury on eight separate questions, which certainly covered the material aspects of the case. The learned trial judge in dismissing the complaint said : " I think that under the evidence this morning there is, perhaps, sufficient to justify the jury in finding that this boy fell because the beams under him were rotten, and I should not nonsuit on the question of assumed risk or on the question of contributory negligence, but the work that they were doing, the work the boy knew they were doing, was the taking down of this roof ; he was ordered to go there by one of the foremen ; it strikes me that order concerned a detail of the work and that if the foreman was negligent in ordering him to go to an unsafe place it was the negligence of a co-servant and there can be no recovery here ; I think

that on that ground I must nonsuit; I will make an order dismissing the complaint."

The learned trial judge was evidently of opinion that this case ought to go to the jury were it not for the fact that he was constrained to nonsuit on a question of law. I am of the opinion that the ordering of this plaintiff on the roof was not a detail of the work nor was the foreman a co-servant. A man going upon a sloping roof to labor undoubtedly realizes that the situation is more or less dangerous and requires alertness and caution in order to prevent a serious fall, but it is neither an assumed risk nor a detail of the work that his employer knowingly sends him upon an unsafe structure which is not obviously so to a workman entering upon it.

The defendant in its answer avers that on the day in question the plaintiff "was directed by the agents of the defendant to do certain work on the roof of a building," etc. The plaintiff and his companion on the roof, McIlroy, both testified that Mr. Derouin ordered them upon the roof, and the plaintiff swore that he was a millwright. It is clear that Derouin was the agent alluded to in defendant's answer, and was the foreman or person in charge of the work; he was the *alter ego* of the defendant, and his act was its act in sending plaintiff into the unsafe situation that resulted in his injury.

The judgment appealed from should be reversed and a new trial ordered, with costs to abide the event.

Concur; VANN, J.